All right, please be seated. We're ready to hear argument in our next case, Williams v. Genex. Mr. Woodfield. Mr. Woodfield, while you're assembling your records, I want to make a statement. For me, just considering Williams' evidence, it seems to me that the learned professional exemption applies to her, using her own evidence. Well, Your Honor, I've got an entire dispute on that. Can you speak up just a little bit? I'm in trouble here. Certainly, and I'm not sure. Can I get you to restate that just one second? I didn't hear the predicate sentence you said. All right, I said just considering Ms. Williams' evidence alone, it seems to me that the learned professional exemption applies to her. Your Honor, I would disagree, and I would submit that the evidence that she put forward in her brief is strongly to the counter. If you look at the joint appendix that was proffered, and if you look at the briefing that was made at JA, let's see. I didn't mean to throw you a curveball. I just wanted to get that out on the table. Well, no, I appreciate that, sir. Let me skirt ahead on my brief here. To the summary judgment brief, if you note, there's pages 16 through 26 of the summary judgment opposition, which we've included in the joint appendix, which I can pull out. We put forward a list of plaintiff's asserted facts that are in the joint appendix that run from roughly 600, or from JA 625 through 667, but also in the summary judgment opposition, which lists the testimony of Ms. Williams. Let me start off by saying, and forgive me, sir, I am Nick Woodfield, and may it please the court, I am here on behalf of Ms. Williams. I would like to, before we start, we filed a 28-J letter, and I'd like to point out a correction on that letter. I have appended on that letter the proper cases, but there is a reference to Negro versus Sears, Roebuck & Company, 778, F3rd, 1096, which is a Ninth Circuit case, 2015. The actual decision is Negro versus Sears, Roebuck & Company, 784, F3rd, 495, Ninth Circuit, 2015. The proper decision is appended to the 28-J letter, but the reference is to the first case that was pulled and was subsequently replaced, so I wanted to make sure that the record was correct there. In terms of the arguments here, I would point out that... ...registered nurses say that if you are such, you generally meet the duties of the Learned Profession Exemption. Your Honor, the Cook case that we cited, Cook versus Care Star, deals with that exact same issue, as does the Powell case from the District Court of D.C. that we cited. The issue, because, for example, in the Cook case, Cook case notes at page 8, it is undisputed that the Ohio Administrative Code requires the licensure of case managers in either nursing or social work, and that Care Star imposes the same licensure requirement. Well, I mean, the District Court acknowledged that it's not a presumption in the traditional sense, but it doesn't help you. Well, no, but I also think it's, quite frankly, and not meaning to be disrespectful, a complete red herring, the reason being is the professional exemption turns on two requirements. First, that there needs to be a salary basis, and then the second requirement needs to be that there's a primary duty of work that requires knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged study, as opposed to specialized of intellectual instruction. Now, the important thing about this are these three prongs, and I would submit the second two prongs are met here, but the first prong isn't. Let me ask you to follow Judge Hamilton's initial point. I'm looking at page 340 of the appendix, which is Ms. Williams' own qualification summary, and the items that she ticks off, this is her evidence, describe her activities as promoting continuous quality care, requiring intervention, design of strategies, corrective action plans, comprehension of complex health care concepts, strong academic credentials, promoting collaboration and optimal patient incomes. There's something in here about an expert witness. Designing and research-driven life care plans, extensive client interview process, litigation support, trust management. Those don't seem like the activities of a scribe, as you described yourself. Your Honor. This is her evidence. Your Honor, at the CFR 541-700B, you look at how much time she spent doing this. Ms. Williams was a case manager, and this is her resume that she has. But I would submit that in her resume, she did not mention the fact, and it's undisputed, that she drove from appointment to appointment. It's undisputed that she would go and pick up prescriptions at pharmacies. She would attend these doctors' meetings and write down the notes of what was being taken place. But she would also go and just see what's going on in physical therapy, run the errands, come back and write the reports. Your Honor, you look at 541-700. The testimony that she spent at least one day a week doing these reports on patients. The testimony was that she wrote reports roughly 10 percent of her time. And that's what you can give us a JA site for that later, because I don't recall seeing that picture. I believe that was in the judge's findings below, in the judge's opinion that he found that she wrote reports roughly 10 percent of her time. Well, you had previously mentioned that Cook, I think the Johnson case is on this. And it seems to me that the point that Judge Agee and Judge Hamilton were getting to in terms of the testimony of Ms. Williams, she did testify that condition of care and being a master coordinator were essential functions of the job, which goes more beyond the fact that she was just a scribe or someone who's just driving someone around. Your Honor, and I believe the Cook case really addresses this. The question is what percentage of her time she was doing these matters. I would submit that there are certain qualifications in here that she was required to have and certain things she did that would be exempt work. But the question is what was her primary duty. And that's, as I was going back to, you look at the first prong, the employee must perform work requiring advanced knowledge. And if the great majority of work doesn't require that advanced knowledge. Well, one of her supervisors, I can't remember which one, testified that position that she spent 90 percent of her time doing discretion and judgment-oriented functions. And they described in detail what they were. And it was my impression that that allocation of time was not rebutted. Your Honor, if you look at the last question of it, and that was at JA 172 to 173, he acknowledged he didn't know what percentage of her time he spent doing anything. He was speculating as to what her job tasks were. The burden of proof in a case. Well, did she ever, was there, what's your best evidence to rebut that testimony? Her own testimony being put forward to the counter, sir. And that's what the judge, the court below, found was. I don't mean to keep interrupting you, but can you give us a specific reference in the record that says, no, this gentleman's testimony is incorrect. I don't spend 90 percent of my time doing the things he described. He was, if I recall correctly, he was deposed after her, so she didn't have that opportunity to testify as to what Mr. Nussdorf's testimony was. This case goes off on summary judgment, is that right? Yes, sir. So that meant that for the case to get to summary judgment, the parties had to agree that there were no material disputes of genuine fact left. So the onus was on you, once that evidence came into the record, to produce evidence in some form to rebut it. Isn't that correct? Well, we didn't agree that there were no evidentiary disputes left, but yes, the evidence was for us to refute the evidentiary proffer made by GenX as the moving party. And, well, at some point before you're done today, if you could tell us this is my best evidence, here's the page in the joint appendix that really rebuts his testimony. I would point you to 666 to 667, which is where I deposed Mr. Nussdorf, who is the corporate representative of GenX, and I was going through Ms. Williams' position description with her. I said in paragraph 5 it says, I do not provide any direct therapy or nursing care. Is that correct? That answer, that is correct. Regardless of the customer or client medical case at GenX does not provide direct therapy or nursing care. Is that correct answer? Is that correct answer? That is correct. How does that help? Because she's not, the whole exemption here turns on whether she's a nurse, and she's not providing nursing care. This is the corporate representative saying she's not doing. Her job, I don't think there's any dispute. She doesn't provide direct care as in a hospital setting. Her job is different. I'm not sure how the fact that she engages in an insurance management function is what the case is about for FSLA purposes. I don't see how the fact that she's not providing direct care makes a difference for determining what this job function is. Because you have to look at what her primary duty is, and if her primary duty is being an insurance liaison, then that's not a, that doesn't meet the three-pronged duties test, wherein the employee must be performing work requiring advanced knowledge. If she's not, if most of her, if the requisite for her to have this job is that she have a nursing degree but she doesn't use it, then I don't think the dispute is, the title alone, and the Powell case said this as well as the Cook case say, that if the fact that there is a requirement that you have a nursing license doesn't make the job exempt. Now, if she was working in a hospital concept, or in a context, that would be one thing if she was doing medical work. But the testimony from GenX's own corporate representative is she's not doing nursing work. Now, you don't maintain that she has to be doing direct nursing care. I think it seems to me all that's required is the use of knowledge obtained from a nursing degree. Yes, sir. That's all that's needed, not the direct nursing care. She doesn't have to be showing she's doing what she does in a hospital. Absolutely, that is correct. But the issue is what she is doing, the work she is doing, work that requires nursing care. And I would submit that driving to CVS to get a prescription does not require nursing knowledge. I would submit that sitting with a patient saying, here's what the doctor wrote for you, he told you that here are the prescriptions you're going to have doesn't require nursing knowledge. Now, it may benefit her, but quite frankly, I'm an English major and a lawyer. I can read what the doctor said on the prescription and say to someone, take these pills three times a day. But we don't have to look at that. There's no particular time period that we turn to determine whether or not one is engaged in a primary duty. I mean, the full circuit case law is pretty clear on that. Well, Your Honor, I would submit that the duty or the obligation for the moving party here, as in GenX's case, is to prove by clear and convincing evidence that she is not, she doesn't qualify. Forgive me, I've realized I've run over. May I finish? Yeah, finish what you wanted to say. The onus is on GenX as the moving party to prove by clear and convincing evidence that she doesn't qualify for the exemption. In its evidentiary proffer, it provided specific examples over a seven-year time. My count, roughly seven specific examples, but occasional things where she was performing exempt duties. But the lion's share of her work we put forward in evidentiary proffer, she spent doing opposite or non-exempt work. Under the Cook case, under the Johnson case, and under the Powell case, they said these are fact questions. Okay. You've reserved some time for rebuttal, so we'll now hear from Mr. Puma. Thank you. Good morning. May it please the Court, Michael Puma from Morgan Lewis for GenX. Where I'd like to start, if I could, and I think it's important, is the policy behind the FLSA. And oftentimes you see these cases, you're dealing with assistant managers in a retail environment, lower paid workers. And this Court has recognized repeatedly multiple opinions that that's really what the FLSA is intended to protect, the most vulnerable workers in society. Here we're dealing with someone who's a highly accomplished professional who has multiple degrees, multiple certifications. She was paid nearly $85,000 plus bonus. And this Court really, under its decisions in Darvaux, Altamus, Counts, makes clear over a period of a decade that she sort of starts at a disadvantage in trying to claim that she's non-exempt under those circumstances. The corporation here, the GenX, is one that has business in multiple states, I understand. It does, Your Honor. And in some states, you don't need a nursing degree. Is that correct? I actually don't know that to be true, Your Honor. I think generally you do. I think that's required generally by the state certification board. And I know that in Maryland, for instance, it's undisputed that every nurse case manager is an RN, and they must be under the state licensing board, and that's undisputed. Does it matter that if, well, let's just say hypothetically, if you didn't require one, let's just say in another state, and you did the exact work, and you didn't need a nursing degree or any other type of degree, but Maryland does require it, and Maryland has a heightened view in terms of what is required here. Does that matter? Do we look at it in terms of what the state actually requires, or do we look at it in terms of the duties as they exist in other states and other areas, and is there really any need for a nursing degree even though Maryland requires it? Sure. And, Your Honor, I think this case, the way the parties positioned this case, was to defer any issues of conditional certification and focus on the individual claims of this plaintiff, Nancy Williams. And all that matters is the record on this plaintiff who is in Maryland and whether GenX independently requires an RN in Maryland, or instead the job description says as it does, you must meet all the Maryland certification requirements. Either way, it's undisputed that you must be an RN, and I think counsel for Ms. Williams has conceded that, that really we're looking now only at prong one of the professional exemption test. Now, I think that Ms. Williams, she really, the Reeve case, Reeve v. Coventry, is informative because very much like here, what Judge Carter said in that case was, the facts aren't really in dispute. What's in dispute is the party's vocabulary. And Ms. Williams here, she describes herself as a scribe. She says that anyone off the street, including a lawyer, could come in and do her job. And, you know, I think the court has to start questioning whether that makes sense. Would GenX be paying someone $85,000 a year if anyone could do this job to just be a scribe? People would be lined up down the street trying to get this job. And I don't think that really makes sense, doesn't add up. And this court looked at that in the Altamus decision. And I want to talk about that decision if I could. But I think it's important and it's really close to this case. How does that help us come to a conclusion? I think problem one is probably the one we'll focus on in any event. How does the fact that they pay her a lot of money have anything to do with what her real work has done on it? I don't know if that may well be that having, they're just required to have it, have someone with a nursing degree. And to get someone with a nursing degree, they may have to pay that person more money, but it doesn't necessarily transform into a statement that that is needed. And, Your Honor. Except for to get it because the state law requires it. Yeah, and I'll move past the compensation. I do think that policy issue is important and this court's recognized it. But let me focus on her actual duties. And the court pointed out her resume, which she agreed in her deposition is an accurate reflection of her duties at GenX. There's the job description, which she agreed is an accurate representation of her duties at GenX. We walked through training guidelines that she received from GenX that detail what she's expected to do. And I'll get in just a moment to the actual specific day-to-day duties that arise out of these things. She agreed, as she had to, that the Maryland regulations governing nurse case managers bind her that she follows them. And so what do we see when we look at these documents? The resume. This is her description of her job. Assessing patient needs. Designing research-driven care plans. Extensive interviews. Collaboration with the treatment team. Projecting medical and economic impact. And, ultimately, a proven ability to comprehend complex health care concepts and to promote strategies in connection with an action plan for patient care. You look at that, then you look at the training she went through. And some of the guidelines that she points to as constraining her discretion. Really what they say, for instance, the Liberty Mutual, one of the client guidelines. This is at Joint Appendix 456. So what we've got, you've given us a lot of facts, but when you look at those facts, they really are across the board quite a bit, from case management right to clerical work. And when we get into this very fact-intensive type inquiry, is this appropriate summary judgment? Well, Your Honor, I think it is, and I think this is different from, for instance, counsel referenced the Johnson case. I think it's Johnson v. Wellpoint. In that case, there were a variety of plaintiffs. The defense counsel in that case put in an 800-page response to the plaintiff's statement of facts. And I think what the court said was there's virtually no fact in which the parties are in agreement. In that case, some of the plaintiffs, it was testified, spent 85 to 90 percent of their time on data entry. Now, in this case, the plaintiff described how many hours a week she spent on writing reports. And I can talk about the reports and the analysis that goes into them. But, and this is in our brief, when asked, well, what are the other administrative clerical functions? That was it. It was the reports. And whether it's 10 percent of her time or 20 percent of the time, as the court pointed out earlier, it really doesn't matter. This court in Counts, in Jones, in Altamus has repeatedly recognized that 50 percent is by no means some quantitative test that you must meet in order for the exemption to apply. And just while I'm on that point, I would just mention also that the counsel talked about the Cook case. And Cook, in that case, and I think counsel mentioned it as well, the options were to be an RN or a licensed social worker. So very different from this case. Being a licensed social worker would not have worked here for Ms. Williams. That's undisputed. And in the Cook case, the salary basis test wasn't even met. The individual was paid on a fee basis. And counsel mentioned the Powell case, Powell versus American Red Cross, which actually favors our position. And it's very similar in that the plaintiff was trying to use different labels to challenge the actual duties. And anyone could come in and call what they do on a day-to-day basis clerical or a scribe. But the question is not labels. It's what do you actually do. And Ms. Williams tells us that in her resume. Her job description tells us that, for instance, educating patients on their disabilities and answering questions claimants may have to facilitate the return to work. That's the job description, JA 683. So what we have is, if we accept where you're going with this, that is that the evidence is undisputed in terms of her job responsibilities. But tell me where in the record you've articulated what is the knowledge that you get from having a nursing degree. Because we got it on this end, and I guess we're assuming it comes from here. But is there evidence in the record of what a nursing degree, what knowledge you get as a result of attaining a nursing degree? Well, I think, Your Honor, that that's whether she is performing work or has a degree that results from a prolonged course of specialized education, those additional prongs, I think we've agreed is not in dispute. If the question is does she use the advanced knowledge from a nursing degree, I would say the record is pretty clear that she does. I mean, honestly, if the court were to look at it. The question is what is that knowledge of a nursing degree? And then because your contention is it meets the first prong of being used, but we must know that her job responsibilities actually require the use of that advanced knowledge. See where I'm going with this? I do. And I think, Your Honor, if the court were to look at some of the sample reports, I mean, there were hundreds of them, but we included some of them with our brief as a sample, and I think they're representative. And there's been no affidavit put in in opposition to summary judgment suggesting they're not representative, just as there was no affidavit put in suggesting that Mr. Nussdorf's testimony was incorrect. But if you look at some of those reports, it's very clear that none of us probably in this room who are not certified as nurses could do this job. And it involves, if you look at the certification, the training, it involves analyzing a patient's medical condition independently and being able to listen to what the doctor is saying and answer questions for the patient, facilitate the patient's return to work, to go to the insurance adjuster and to explain this is what the doctor is proposing, but I have another idea. I have a different recommendation for an alternative course of treatment. And you need the medical knowledge to do that. And if you look at some of these reports and the diagnostic information, when I read them, I don't even know what the diagnostic information means because I don't have a medical background. And only a nurse really could understand that background. Did she need a nursing degree or just a degree from a health-related field? Well, if you're going to work for GenX in this particular job, you need to be a certified RN because the job description says that you must comply with the certification requirements in Maryland, which requires you to be an RN. And I think all that matters here for our purposes is her job, her individual effects, her employment for GenX. And so how do you use that nursing information? Well, again, if you look at, and this is at Joint Appendix 546 to 549, and she acknowledged at 312 to 319 that, of course, she follows the Maryland guidelines. The RN must analyze the data, make a determination as to whether the selected treatment options are appropriate. The RN shall identify expected outcomes and document measurable goals. The RN must develop a plan of care, implement the interventions, evaluate ongoing progress. I know that I couldn't do that. And that's GenX's belief as well, and that's why you need to be a licensed RN. Your Honor, in terms of the exercise of judgment and discretion, which is also important to this, I don't know that there could really be a clearer case of the exercise of judgment and discretion. First, I just want to mention that the administrative exemption for the FLSA, and this is clear from the preamble, and this is noted in our brief, actually sets a lower bar, a higher bar, I'm sorry, for the exercise of judgment and discretion. So under the professional exemption, it's sort of judgment and discretion light, and that's clear in the preamble from April 23, 2004. This employee had virtually no oversight. And actually, when we were at her deposition, Mr. Nussdorf came with me, and it was a bit of a reunion because she testified she hadn't seen him in two years. She hadn't seen her first-level manager in a year and a half. This is at Joint Appendix 247. She testified at the same location that months would pass without any calls and that long times would pass without even any e-mails. She testified that her managers would not sit in on her calls, they wouldn't edit her e-mails or participate in the meetings with patients or doctors, and that when they edited her reports to the extent that they did, it really was to comply with the templates that the clients wanted so the clients could get information in the form that they want. Just as courts have requirements for how we present information and very strict requirements that's methodical, it doesn't mean the arguments presented within that format are not the result of judgment and discretion. There's also a question raised by Ms. Williams as to whether she really is performing exempt work. Is she really exercising judgment and discretion given the client guidelines that could apply to her? Well, number one, there's plenty of authority, and it's in our brief from multiple circuit courts, confirming that the use of guidelines and procedures doesn't make you non-exempt. And there's an example in one of those cases of pilots. In a pilot or in a nuclear industry, you work in a highly regimented, regulated environment. There are many procedures you must follow, but you have to use your discretion and judgment to work within those procedures. So even putting that aside, the guidelines themselves actually end up favoring Gen X because they make very clear that Ms. Williams is not a scribe. And nowhere has she said, those guidelines are wrong, I don't follow the client guidelines. So, for instance, Sedgwick, one of the clients, this is at Joint Appendix 504, says the case initial action plan must include short and long-term goals and specific actions. To the idea of being a scribe, Liberty Mutual at Joint Appendix 456 says, the case manager's reports must reflect the case manager's assessment and observations of the patient rather than regurgitating the provider's notes. CNA's guidelines at Joint Appendix 486 require, as part of her job, and she testified that she was doing her job and didn't dispute she followed the client guidelines, they require critical analysis in evaluating the proposed treatment plan, assessing the case, addressing the plaintiff's anticipated return to work, and that the nurse work to seek alternative ways to accommodate the job. And just briefly, if I didn't note this before, the percentage of time that she may have spent on one or more of these activities, that's not really the question. And there was an older decision that was cited in appellant's brief before the 2004 amendments where it may have been more of a quantitative test, but this court's recognized multiple times since then that it's not a 50% test. The question is, what is the most important duty? Why does this job exist? And this job does not exist for Ms. Williams to be a scribe. Last point I'd like to make, and then I can sit down unless the court has questions, is in the alternative, we argue the administrative exemption as well. And the court, to the extent there's any concern with the use of advanced knowledge, the court could affirm on the alternative grounds of the administrative exemption. And really what that would require is that Ms. Williams is performing work that is of significance to the general business operations of GenX or its clients. And in this case, its clients are employers, they're worker comp insurers, and both of them want nothing more than to get their patients, these injured workers, through the medical treatment they're receiving as quickly and cost-effectively as possible. And we've cited testimony in our brief explaining why that economic cost containment is so central to her function. And then the administrative exemption requires the same level of, again, requires judgment and discretion, which I've explained is easily met here for an employee with virtually no oversight. Unless the court has any questions, I don't have anything else. Was that a basis for the district court's decision or for the court below, I mean the decision below, administrative rationale you just gave? I'm sorry, Your Honor? Was that a basis for the decision below? No, no, it was not. It would be an alternative. So if the court had any question with the profession. Did you brief it? Sorry? Did you brief it? We did. Yeah, we did brief it below. And the court did not reach that alternative argument because it ruled. Brief it for us. I don't believe we did, but it's in the record. So if the court had any question around the professional exemption, I don't think the court should, but it could remand to the district court to rule on the alternative exemption. One last question, and it's just a matter of just thinking. Is Ms. Williams required to carry professional liability insurance of any type? Your Honor, I don't know. I believe that would have been provided by Gen X probably, but I'm not sure. I don't believe that that's in the record. Thank you. Thank you. Thank you very much. We'll hear from Mr. Woodfield. He has some time reserved. I'd like to answer that question. Ms. Williams is not required to have professional liability insurance because she wasn't acting as a nurse and it's undisputed that she was not acting as a nurse. She was told not to provide medical care, and it's not in her position description. I would refer the court to the joint appendix at 682 for the position description, and I would submit that what Gen X is trying to say is that because the state of Maryland says we want people with this position title to have a nursing degree, it's trying to say that the position that we had her perform, regardless of the duties we have, is an exempt position. If you look at its own job description that it authored, its own education requirement at 682 of the joint appendix is a diploma, associate or bachelor's degree in nursing or bachelor's degree or higher in a health or human services-related field required. But in Maryland, those people couldn't do the job unless they had an RN. But, Your Honor, I think that that, again – Is that true or false? That is true, but that doesn't change the job duties and responsibilities. Maryland had a requirement that in order to have the position of case manager, you need to have hair. It wouldn't have any bearing on what they actually did for Gen X because Gen X's job description said what they have to do. Now, I would also submit that when the Altamus decision that my opposing counsel referenced, not only in the Altamus decision was there a position description that the court relied upon. The position description and the annual reviews were not contested. The difference between us and the Altamus decision is that in the Altamus decision, there was an affidavit given, and it was essentially a sham affidavit case. Here it's deposition testimony, and the deposition testimony was not credited by the judge because the judge below said it was self-serving. But if you look at the joint appendix below at 578, 586, Ms. Williams gave specific examples of what she did each day, such that she should not be deemed to be in a nursing capacity, such that she wasn't using her nursing experience. We would submit that that evidence should have been given credit or should have been afforded some degree of credibility because under the Tolan decision and under Supreme Court precedent, it's not proper to make credibility determinations at the summary judgment stage. The only time it would be proper is if the evidence such as the court found, as this court found, was like it was in Altamus, where the court found that the affidavit given in Altamus was not credible in light of the evidence that she had signed before. Like, for example, her annual reviews that documented what she had done. There is no such evidence here. Here you've got a fact question. Moreover, the court below relied on read. What does the court do in the summary judgment situation where a party has evidence, which would be the non-movement, but their own evidence contradicts itself? Well, Your Honor, I think you have to look at the extent to which there might be contradictions because that would be you've got a situation where you've got a, for example, the sham affidavit rule where you've got someone whose testimony subsequently might be impeached, but where you've got a situation here where she's saying, this is what my resume says, but it's clear that she isn't just going from one case evaluation. I realize you want to now adjust to the facts of your case, but if you exclude the movement's evidence completely, just as a hypothetical matter, and the non-movement's evidence, which is their burden to come forward to show the dispute of material fact, if their evidence is completely contradictory, how does that create a dispute of material fact? In a hypothetical situation, I think you would have to look to the extent to which it was completely contradictory because if it was wholly contradictory, then I think you have the basis for a logical decision like the sham evidence rule. But in this situation, in this particular situation, you have bits and pieces that might be used for impeachment, but what you've got here is a situation where the court is saying, because GenX has presented information that it might use for impeachment, that Ms. Williams is therefore precluded from putting on evidence in opposition to summary judgment. And I think that is beyond what the courts require of someone. Moreover, I would submit that the movement's own evidence, its own position description, doesn't require Ms. Williams to be a nurse, and it doesn't say that she needs to use her nursing skills. For example, you could have a master's in public health and do this job. You could have an associate's degree. Not in Maryland. Pardon? Not in Maryland. Not in Maryland. But again, the fact that Maryland and Ms. Williams worked in Maryland, Virginia, she had cases in New Jersey, in Delaware, and in Pennsylvania, and the fact that Maryland said that you need to have a nursing license to have this job title does not convert the job into an exempt position, especially when GenX writes its own position that is not necessarily, there's no proof showing that the job that's contemplated by Maryland that would be a nursing position is the same as this job description. And that burden is on GenX to show that they are on all fours. Because if GenX had a job that was called case management. She had to have the Maryland license in order to work for GenX. So I thought the parties were in agreement that if any of her work took her to Virginia or Pennsylvania or any of the other adjoining states, that she still carried with her, she was cloaked and had to be cloaked with the Maryland certification. I don't know if that was agreed to by the parties. And I don't know, frankly, the extent of nursing licensing such that if you're a nurse and you travel. But she's separately licensed, isn't she? You're certified as this insurance case manager. I'm sorry, sir? Isn't she separately certified for the state of Maryland as an insurance case manager, isn't that a separate designation? Yes, sir, and that's a non-exempt job. Well, my point is that in order to have that, she had to be a registered nurse. So by virtue of carrying the Maryland designation, that was her authority to do the job based on the Maryland certification when her job duties carried her to other states. Your Honor, I'm out of time, but I would be happy to answer. Please. Your Honor, yes, but I think that that is putting a form over substance or taking a form over substance approach to this position in that what it's saying is that if there was, and I take this to a sort of extreme example to prove it, if someone said in order to be a brain surgeon you need to be medically licensed and have a, you need to have a medical license and you need to have certification in neurosurgery, and then that person every day went to work and all they did was sweep floors and you looked at their primary duties, then they would not be an exempt employee regardless of the title and regardless of their qualifications. Now, I realize that's an absurd example, but in this situation the evidence that GenX put forward of what its actual job duties were do not reconcile with that of a nurse, and this is buttressed by the fact that GenX tells people you are not to work in a nursing capacity. What it wants to do is say because you've got some nursing knowledge we want you to use it, but in its position description it likewise said that because if you have health care knowledge that will be completely sufficient as well except in the state of Maryland. So the problem is because Maryland has this administrative prerequisite, it doesn't change her substantive job duties and responsibilities, sir. Anything else? Unless Judge Hamilton has something further. I think we're done. We appreciate your arguments. We're going to come down and greet counsel, and then we're going to take a very brief recess.
judges: G. Steven Agee, James A. Wynn, Jr., Clyde H. Hamilton